# United States Court of Appeals

### *for the*

# Fifth Circuit

---

Case No. 25-30016

ALBERT K. ALEXANDER,

*Plaintiff-Appellant,*

v.

DWAYNE ARCENEAUX; JEFF HEBERT; CALVIN PARKER;
KYLE P. MANCEAUX; GREG CORMIER; JARVIS MAYFIELD;
JAMES CRAFT; KRISTINA BERNARD STRONG,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, LAFAYETTE

## BRIEF FOR PLAINTIFF-APPELLANT

BRUCE C. BETZER
LAW OFFICE OF BRUCE C. BETZER
*Attorneys for Plaintiff-Appellant*
3129 Bore Street
Metairie, Louisiana 70001
(504) 832-9942

25-30016, Alexander v. Arceneaux

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Dwayne Arceneaux | Joy Rabalais of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Dwayne Arceneaux | Grant Schexnailder of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Greg Cormier | Joy Rabalais of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Greg Cormier | Grant Schexnailder of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| James Craft | Joy Rabalais of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| James Craft | Grant Schexnailder of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Jeff Hebert | Joy Rabalais of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Jeff Hebert | Grant Schexnailder of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Kyle Manceaux | Joy Rabalais of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Kyle Manceaux | Grant Schexnailder of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |

| | |
|---|---|
| Jarvis Mayfield | Joy Rabalais of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Jarvis Mayfield | Grant Schexnailder of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Calvin Parker | Joy Rabalais of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Calvin Parker | Grant Schexnailder of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |
| Kristina Strong | Joy Rabalais of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA 337-232-1604 Ext. 232 P. O. Box 4305 Lafayette, LA 70502-4305 rabalais@bornewilkes.com |
| Kristina Strong | Grant Schexnailder of Borne, Wilkes & Rabalais, L.L.C. Lafayette, LA |

| Appellants: | Counsel for Appellants: |
|---|---|
| Albert Alexander | Bruce Betzer of Law Office of Bruce C. Betzer Metairie, LA 504-832-9942 3129 Bore Street Metairie, LA 70001 bruce@brucebetzer.com |
| Albert Alexander | Leonor Prieto Metairie, LA |
| | |

S/Bruce C. Betzer
Attorney of record for Appellant

ii

## **(b) STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellant avers that, because this matter involves review of intertwined criminal and civil proceedings, including a record of twenty-two (22) volumes, oral argument would aid this Honorable Court in deciding the issue on appeal.

## (c) TABLE OF CONTENTS

**(a) CERTIFICATE OF INTERESTED PERSONS** .............................................i

**(b) STATEMENT REGARDING ORAL ARGUMENT** ................................. iii

**(c) TABLE OF CONTENTS** ...............................................................iv

**(d) TABLE OF AUTHORITIES** .........................................................vi

**(e) JURISDICTIONAL STATEMENT** ..................................................1

**(f) STATEMENT OF ISSUES** ..........................................................1

**(g) STATEMENT OF THE CASE** ......................................................2

**Background Facts** .......................................................................2

**A. Introduction** ..........................................................................2

**B. Police Conduct** .......................................................................4

**i. Investigation and First Search Warrant** ........................................4

**ii. Second Search Warrant Executed January 5, 2011** ..........................8

**iii. Third Search Warrant Executed January 6, 2011** ...........................9

**iv. Criminal Proceedings** .............................................................10

**(h) SUMMARY OF THE ARGUMENT** ..............................................12

**(i) ARGUMENT** ..........................................................................16

**Summary Judgment Burden and Standard of Review** ........................16

**Fourth Amendment Claim—Unconstitutional Search and Seizure of Property** ...........................................................................18

**(A) Fourth Amendment Violation** .......................................18

**(B) Whether Alexander had a Cognizable Privacy Interest in the Property** .......................................................................19

**(C) Whether the Officers exceeded the warrant and were justified in relying on the plain view doctrine** ..............................23

**(i) Plain View** .................................................................23

**(ii) The trial court's distinguishing of Cremar was erroneous** .........................28

**(D) Whether, to a reasonable officer, the incriminating nature of the items seized would have been immediately apparent under a totality of the circumstances** ..........................................36

**(j) CONCLUSION** ............................................................43

**(k) SIGNATURE OF COUNSEL** .......................................45

**(l) CERTIFICATE OF SERVICE** ......................................46

**(m) CERTIFICATE OF COMPLIANCE** ...........................47

## (d) TABLE OF AUTHORITIES

A. **Cases**

*Alexander v. City Police of Lafayette, Case No. 6:11-CV-01749, 2024 U.S. Dist. LEXIS. 229832; 2024 WL 5181962* ........................................................................*21*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................16, 18, 37

*Arizona v. Hicks*, 480 U.S. 321, 94 L. Ed. 2d 347, 107 S. Ct. 1149 (1987) .....*passim*

*Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) ...............................................................................17, 34

*Byrd v. United States*, 138 S. Ct. 1518, 200 L. Ed. 2d 805 (2018) ...................19, 22

*Camreta v. Greene*, 563 U.S. 692, 131 S. Ct. 2020, 179 L. Ed. 2d 1118 (2011) ....17

*Cass v. City of Abilene*, 814 F.3d 721 (5th Cir. 2016) .............................................17

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ...16

*Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) ................................................................................................................1

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) .................................................24

*Creamer v. Porter*, 754 F.2d 1311 (5th Cir. 1985) ..........................................*passim*

*Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994) ........................................................17

*Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990) ....................................................................14, 24, 36, 41

*Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987 (5th Cir. 2005) .........................17

*Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507,
19 L. Ed. 2d 576 (1967) ...............................................................14, 23, 24

*Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) .................18

*Minnesota v. Olson*, 495 U.S. 91 (1990) .................................................21

*New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336 (5th Cir. 1996).............16

*Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).......24

*Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755 (5th Cir. 1996) ......................16

*Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979)...........19

*Tolan v. Cotton*, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)...................................17

*United States v. Paige*, 136 F.3d 1012 (5th Cir. 1998)...........................................19

*United States v. Richard*, 994 F.2d 244 (5th Cir. 1993) .........................................19

*United States v. Turner*, 839 F.3d 429 (5th Cir. 2016) ...........................................23

*United States v. York*, 895 F.2d 1026 (5th Cir. 1990) ............................................23

## B. **Statutes**

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

42 U.S.C. § 1983 ...................................................................................1, 2

Fed. R. App. P. 4(a)(1)(A) .......................................................................1

Fed. R. App. P. 4(a)(5) .............................................................................1

Fed. R. App. P. 32(a)(5)..........................................................................47

Fed. R. App. P. 32(a)(6) ........................................................................47

Fed. R. App. P. 32(a)(7)(B) ...................................................................47

Fed. R. App. P. 32(f) .............................................................................47

Fed. R. App. P. 32(g)(1) ........................................................................47

Fed. R. Civ. P. 56(c) .............................................................................16

U.S. Const. amend IV ......................................................................*passim*

## (e) JURISDICTIONAL STATEMENT

Plaintiff-Appellant's 42 U.S.C. § 1983 claims alleging violations of the Fourth Amendment, *inter alia*, were filed in the Federal District Court for the Western District of Louisiana pursuant to 28 U.S.C. § 1331, federal question jurisdiction. The district court entered a summary judgment order resolving all claims.[1] Plaintiff filed a notice of appeal on January 14, 2025, within 30 days of the final judgment as required by Fed. R. App. P. 4(a)(1)(A). Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction because the order disposed of the entirety of Plaintiff's claims in granting summary judgment.[2] After the court set the briefing schedule, the Plaintiff-Appellant moved to file for one extension of time under Fed. R. App. P. 4(a)(5) making the brief due on or before April 16, 2025.

## (f) STATEMENT OF ISSUES

(1) Whether the district court erred in granting summary judgment, extending qualified immunity to Defendants to shield them from Albert K. Alexander's

---

[1] ROA.7552, *et seq*. (Memorandum Ruling dismissing public defendants). A Partial Judgment issued disposed of all non-governmental defendants (ROA.3404-5).

[2] This Honorable Court has appellate jurisdiction over final decisions of the district court pursuant to 28 U.S.C. § 1291; *See, e. g., Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

1

42 U.S.C. § 1983 claims for Unconstitutional Search and Seizure of His Family Home.

*Included Issues:*

a. Whether Alexander had a cognizable privacy interest violated by the unconstitutional warrantless search.

b. Whether the officers exceeded the warrant and were justified in relying on the plain view doctrine.

c. Whether, to a reasonable officer, the incriminating nature of the items seized would have been immediately apparent under a totality of the circumstances.

## (g) STATEMENT OF THE CASE

### 1. Background Facts

*A. Introduction*

Mr. Albert K. Alexander ("Alexander") filed and began prosecuting his original 42 USC §1983 action from behind the bars of the Lafayette Parish Correctional Center, where he was incarcerated in early 2011 and held pending trial for two years. Of the fourteen (14) original charges billed against Alexander, twelve (12) were eventually dropped by the prosecution for a lack of evidence before trial.

2

Alexander won not guilty verdicts at trial for the two (2) remaining charges, possession of stolen property on January 15, 2014.[3]

It was not exactly a Pyrrhic victory for Alexander because freedom is never something to be taken for granted, but it was bittersweet in that he spent two years of his life incarcerated because of charges brought pursuant to an unconstitutional search of his family home located at 212 I-B Street in the City of Lafayette, Louisiana where he had resided since 2000.[4] Even more damaging, he suffered the unconstitutional seizure and destruction of his personal property, which consisted of an assortment of cherished personal items, household items, and other materials, which were all essential to the ongoing renovation and restoration of the property following damage it sustained in a hurricane.[5]

The Lafayette Police Department ("LPD") executed the original search warrant and conducted the investigation, based on little more than the vague and contradictory assertions of a family member, who had an inherent motive to fabricate the basis for the charges against Alexander. The investigating officers seized and

---

[3] ROA.946-949, 979.

[4] Around 2005, Plaintiff undertook paying the back taxes owed on his grandparents' home and with the intention of completing a full renovation, began storing household items and other tools there.

[5] *See* Photographs at ROA.1398-401, 910, 2061-66, 2207-213.

3

re-distributed many of Alexander's household possessions stored in and around his family house, including his family dogs, which were sent to the SPCA and euthanized even though the LPD was only initially armed with a warrant to search for, "[a]ny and all firearms, ammunition, ammunition clips, ammunition boxes, firearm storage boxes, spent projectiles, spent cartridges, firearms or ammunition paperwork."[6] Having no success locating the items specified in the warrant, LPD officers undertook an exploratory search and unconstitutional seizure that exceeded the scope of the warrant and resulted in the seizure of Alexander's possessions, which led to this fourteen-year-long civil suit.

### B. Police Conduct

#### i. Investigation and First Search Warrant Executed January 4, 2011

On December 28, 2010, Alexander asked his step-granddaughter Sharlette Alexander ("Sharlette"), and her girlfriend, Dashawna Morrison ("Dashawna"), to vacate the 212 I-B Street home, where he had given them permission to stay.[7] Unhappy that they were being evicted, Sharlette and Dashawna called and reported an alleged altercation with Alexander to the LPD.

---

[6] ROA.86 (unpaginated, following Pg. 85, paginated).
[7] ROA.407.

The report, taken and filed by Officer Jason Eppley ("Eppley") made clear: "neither [Sharlette] nor [Deshawna] showed injuries consistent with the above statements."[8] These reports were made the day after the alleged injuries, where Sharlette alleged that Alexander, "shoved her to the ground striking her with a closed fist [...] hitting her in the nose and mouth."[9] Deshawna added that during the alleged altercation, Alexander had tackled her and "hit her in the face causing a busted lip in the corner of her mouth."[10] She finished by depicting that, "Mr. Alexander went back and forth punching each of them."[11] Despite this, Officers Chavez ("Chavez") and Eppley noted "suspicious circumstances," namely that the lack of physical injuries was inconsistent with the statement, that Sharlette only wanted her belongings returned, and that Deshawna did not want to sign a statement.[12] Neither woman was noted as expressing any fear of Alexander in the report.

Officer Kristina Strong ("Strong")[13] returned several days later to interview the alleged victims, as she testified in a criminal motions hearing. After meeting

---

[8] ROA.236.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id. See also* ROA.376-77.
[13] Officer and co-defendant Kristina Bernard is now known as Kristina Strong. ROA.6132, *et seq.* (Strong detailed several name changes due to subsequent marriages).

with the alleged victims of the "football tackle" and beating, and seeing no indication or evidence of such an attack, Officer Strong determined solely on these uncorroborated and implausible statements that Mr. Alexander posed a threat to the victims because they alleged he possessed, stored at the rear door of the I-B Street home, a brown and black shotgun.[14]  The alleged victims omitted these facts from their two prior encounters with police, undermining the urgency and credibility of their story.[15]  Mr. Alexander was never tried for any charges stemming from these allegations.

Meanwhile, Officer Calvin Parker ("Parker") just happened to be investigating an alleged threat by Alexander against Alexander's son Todd Alexander ("Todd").   Todd later retracted this far-fetched accusation via an affidavit/declaration in which he stated he was manipulated by Officer Parker and Todd's own stepbrother.[16]   In this affidavit, Todd unequivocally states that Alexander made no threats. Strong, who was Parker's partner, learned of these accusations from Parker.[17]

---

[14] ROA.407-08.
[15] ROA.392-93.
[16] ROA.854, 1078-1084.
[17] ROA.412.

Strong, in an early criminal motion hearing on a motion to suppress, misled the court when she testified that Mr. Alexander remained on probation for misdemeanor charges in December 2008 (DOC # 49372).[18] When questioned about why she included stale information, Strong stated, "[w]hether it was twenty (20) years ago, or five (5) years ago, that has no relevance to me."[19]  Additionally, the application for the search warrant contained a false statement that Alexander had been arrested several times for illegally possessing a firearm, to add a veneer of threatening immediacy to the application for a warrant.[20] Although Strong had justified the search based on articulated concern for the "safety" of the alleged victims-she did not seek to have an arrest warrant issued for Plaintiff-Appellant and did execute a search warrant of Alexander's home when he was not present.[21]

The Lafayette Police chief approved the first warrant and authorized the use of the SWAT division of the police to execute the warrant utilizing an armored vehicle and SWAT team members armed with AR-15 rifles.  Police damaged the threshold of Mr. Alexander's house and other parts of the house and property when executing the warrant and search.  Also, Police cut electrical service to his home and

---

[18] ROA.393-395.
[19] ROA.397.
[20] ROA.393-95, 562.
[21] ROA.377-382.

disabled the water main.[22] However, when Defendants and the Swat team stormed the house, they found none of the "brown and black shotguns"[23] and ammunition upon which they had based the warrant, only a BB gun and a pellet rifle located by a back door.

Instead of ceasing the search at that point, Defendants took time to call Sharlette, and based in part on that conversation, continued to extend their search to numerous household items, searching in bags, moving items, and locating serial numbers on items, including a television. The house was in an obvious state of renovation, with many items in boxes or bags. Sharlette provided vague descriptions of items in the house that she alleged were stolen, including a television, furniture, and electronics.[24] Alexander was eventually acquitted of any charges from these items.   However, the investigating officers took numerous items they had no probable cause to identify as stolen or as evidence of a crime.[25]

### ii. Second Search Warrant Executed January 5, 2011

Immediately after the first search, Strong obtained a search warrant "for the

---

[22] ROA.385, *et seq.*
[23] ROA.384.
[24] *See* some photographs at ROA.5305, *et seq.* However, the amount and value of the items taken remains an outstanding issue of fact more suitable for trial.
[25] *See* ROA.6157-6161.

purpose of seizing the following described things: Household furniture including but not limited to: tan sofa and matching love seat, dark brown leather recliner, canvas print chair with footrest, various portraits, large artificial palm tree plants, 1 bedroom set cherry wood color (dresser, bed side table, head and foot board, and mattresses) and rugs."[26] Strong and Parker returned to Alexander's residence again with the SWAT team ostensibly to confiscate furniture they believed was stolen from Clayton Homes in 2009 or 2010. While seizing and removing the furniture, Defendants again disregarded the limitations of a search warrant and conducted a general search of the carport and backyard, where they examined items unrelated to Clayton's missing furniture: a hot tub, roofing shingles, and a hot water heater.[27] Defendants expanded their activity into an impermissible general search, and it was during this search that Alexander's two dogs were taken away at the request of the officers present. The police refused to give the dogs to Plaintiff's neighbors.[28] The dogs were eventually euthanized while Alexander was incarcerated, awaiting trial.

### iii. Third Search Warrant Executed January 6, 2011

Like the previous two warrants, the third search warrant that Strong obtained

---

[26] ROA.5037.
[27] ROA.851.
[28] *Id.*

was limited to three very specific things: "[a] Whirlpool hot tub, roofing shingles, and a hot water heater."[29] In a warrantless extension to the search, officers seized a cache of building supplies and household items, which could not have been identifiable as stolen without a contemporaneous positive identification even if the officers had the slightest suspicion that the merchandise was stolen.    Officers Strong, Parker and Cormier disregarded this limitation by seizing over twenty items including: 35 pieces of rebar, a refrigerator, 12 boxes of screws, a box of fasteners, children's toys, copper wiring, and an electric fan. LPD Defendants exceeded the warrant's constitutional restraints and violated Alexander's protections against unreasonable governmental seizures.[30]

### iv. Proceedings

Without proper evidence proving the items in question had even been stolen, Assistant District Attorney Haney was forced to proceed to trial on only two charges of possessing stolen goods, which occurred January 13-15, 2014, two years after the searches and arrest.   At trial, Alexander introduced photographs that proved the furniture he was accused of stealing in 2010 had been in his home since at least 2009. In fact Pamela Denman from Clayton Homes was forced to admit, on the stand, that

---

[29] ROA.5362-63.
[30] Id. *see also*, ROA.6234, 6357-58.

the furniture was ordered from a local store, Home Furniture, and had been used to stock many trailers that were sold, which demonstrated that there was a potential for these furniture items to be legally obtainable, either through first or second hand purchase, in the Lafayette area.[31]  Also, officers could never prove that the hot tub they seized was stolen property as the serial number did not indicate such, and another witness testified Alexander had not been at the home when it was transported there. The jury returned not Guilty Verdicts regarding both charges at trial.[32]

This matter has been pending 2011, although it was stayed during the pendency of Alexander's criminal charges.  It is a testament to Alexander's diligence and his sense of justice in the face of injustice that, even in his state of incarceration, he filed the appropriate status reports as ordered by the district court throughout the proceeding.

Undersigned counsel enrolled on February 26, 2019, and the magistrate judge filed a Report and Recommendation,[33] one day later, on February 27, 2019.  The Court adopted the report and recommendation granting a partial dismissal in favor of the non-governmental defendants.  Alexander filed his Third Amended Petition

---

[31] ROA.1491-1497.
[32] ROA.946.
[33] ROA.343.

11

on June 21, 2018.[34] After written discovery and depositions, Defendants filed a Motion for Summary Judgment, which Alexander opposed. The Court granted summary judgment, dismissing the remainder of the claims on December 18, 2024.[35]

The chain of events is shocking in the breadth of the Fourth Amendment violation, but investigating Officers Strong and Parker attempted to seize and/or distribute the entire contents of the house without a warrant or probable cause. Mr. Alexander, in his various *pro se* pleadings, declarations, and deposition, listed numerous household items that were seized and removed from the house for which there has never been an accounting. Some of these items were undisputedly removed. Thus, under the pretext of one warrant to search for weapons, which were not found, the LPD damaged the home and seized much of its contents, including items that bore no criminal indicia whatsoever, such as rice cookers, tools, a child's scooter, and DVD players.

## (h) SUMMARY OF THE ARGUMENT

This appeal challenges the district court's grant of qualified immunity to law enforcement officers who conducted a general exploratory search of Mr. Alexander's

---

[34] ROA.3215-3244.
[35] ROA.7594.

family home without a valid warrant or probable cause, in direct violation of the Fourth Amendment. The court's ruling contains fundamental errors requiring reversal. These errors critically undermined the court's qualified immunity analysis. The right to be free from searches exceeding the scope of a warrant was clearly established at the time of the search, and no reasonable officer would have believed that household items in a home undergoing renovation were "immediately" identifiable as stolen property without further investigation.

Alexander focuses solely on contesting the Fourth Amendment claim regarding the warrantless search and seizure of his property. Appellant urges that the defendants improperly exceeded the scope of the search warrant when they seized property other than firearms and ammunition during the first search of his house at 212 I-B Street in Lafayette, Louisiana.  In other words, a fruitless and mistaken search of Alexander's house for the alleged firearms and ammunition in the warrant was utilized as a Trojan horse to conduct a full, multi-stage search of the premises and seizure of many of the household items therein, none of which reasonably appeared to be evidence of any crime. The four corners of the warrant only contained the authority to search for, "Any and all firearms, ammunition, ammunition clips, ammunition boxes, firearm storage boxes, spent projectiles, spent cartridges,

firearms or ammunition paperwork."[36] Nevertheless, after trained police officers and SWAT team members determined that the weapons they assembled such a force to seize were merely a BB gun and a pellet rifle, they proceeded to remove Mr. Alexander's personal property from the house in an unwarranted fishing expedition to locate allegedly stolen property, with no immediate probable cause that the contents provided evidence that any crimes had been committed.

By extending the initial search 1) after it was clear the firearms described in the warrant were pellet guns and the warrant was satisfied, 2) after calls were made to investigate common everyday items further, and 3) after items were further searched for markings and serial numbers, the LPD, Parker and Strong exceeded the well-delineated exception to the warrant requirement. *See Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967). The "plain view" doctrine is one such "specifically established and well-delineated exceptions" that may justify a warrantless seizure. *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S. Ct. 1149, 1153, 94 L. Ed. 2d 347 (1987). However, the doctrine only permits an officer to conduct a warrantless search if: (1) the officer is lawfully in a position to view the area where the item is located; (2) the item is in plain view; (3) the incriminating

---

[36] ROA.86 (unpaginated, following Pg. 85, paginated).

14

nature of the item is **immediately apparent**; and (4) the officer has a lawful right of access to the item. *Horton v. California*, 496 U.S. 128, 136-37, 110 S. Ct. 2301, 2307, 110 L. Ed. 2d 112 (1990) (**Emphasis supplied**). As the record below illustrates, having finished conducting a search pursuant to a warrant, Parker and Strong violated the well-delineated exception because no reasonable officer would have determined that there was probable cause to continue a search based solely on the mundane nature of the household items, which were immediately apparent. Therefore, the officers had no right to remain on the premises and conduct further searches.

First, the district court failed to properly determine the threshold question of whether Mr. Alexander had a legitimate expectation of privacy in the residence, which the evidence clearly establishes. Secondly, once officers discovered that the alleged firearms listed in the first search warrant were merely pellet guns, the search should have concluded. Instead, the officers embarked on a fishing expedition, examining and seizing numerous unrelated household items only after contacting Sharlette for additional information, moving items, and inspecting them for serial numbers. Thirdly, the district court misapplied the "immediately apparent" element of the plain view doctrine. Officer Strong's own testimony fatally undermines this

15

element, as she admitted she did not "remember what specific information" officers

had about the items being stolen at the time of seizure, requiring further investigation

to establish their incriminating nature.

## (i) ARGUMENT

### 1. Summary Judgment Burden and Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (2018).  A genuine issue of

fact exists only "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).[37]

Typically, the movant bears the initial burden of demonstrating the absence

of a material fact issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.

Ct. 2505, 91 L. Ed. 2d 202 (1986). But an assertion of qualified immunity alters the

usual summary judgment burden of proof, shifting it to the plaintiff to show that the

---

[37] Fed.R.Civ.P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th
Cir.1996); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir.1996); *Celotex Corp.
v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

defense is unavailable. *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016).

Therefore, a plaintiff must "identify specific evidence in the summary judgment

record demonstrating that there is a material fact issue concerning the essential

elements of its case for which it will bear the burden of proof at trial." *Forsyth v.

Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

A plaintiff seeking to overcome qualified immunity must show: "(1) that the

official violated a statutory or constitutional right, and (2) that the right was 'clearly

established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S.

731, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011). Courts of appeal are free to

decide which of the two prongs of the qualified immunity analysis to address first.

*Id.; see also Camreta v. Greene*, 563 U.S. 692, 131 S. Ct. 2020, 2032, 179 L. Ed. 2d

1118 (2011). The second prong is satisfied only if "the state of the law at the time of

an incident provided fair warning to the defendants that their alleged [conduct] was

unconstitutional." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014).

The Fifth Circuit reviews a district court's grant of summary judgment *de

novo*. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 991–92 (5th Cir. 2005).

"Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge, whether

17

he is ruling on a motion for summary judgment or for a directed verdict."[38] The non-movant's evidence is to be believed, and all justifiable inferences will be drawn in his favor.[39] Courts must be cognizant of the dangers of overreaching resolution *via* summary judgment, lest they "transform what is meant to provide an expedited 'summary' procedure into a full-blown paper trial on the merits."[40]

**2. Fourth Amendment Claim—Unconstitutional Search and Seizure of Property**

**(A) Fourth Amendment Violation**

The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), requires that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *United States v. Paige*, 136 F.3d 1012, 1017 (5th Cir. 1998), *citing* U.S.

---

[38] *Id.*
[39] *Id.*
[40] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 268-70 (1986) (*See* Justice Brennan's dissent: "If the judge on motion for summary judgment really is to weigh the evidence, then in my view grave concerns are raised concerning the constitutional right of civil litigants to a jury trial." *Id.*)

Const. amend IV; *see also Creamer v. Porter*, 754 F.2d 1311, 1318 (1985). The

Fourth Amendment clearly protects people from unreasonable searches and seizures

within their homes. *U.S. v. Paige*, 136 F.3d at 1017 (5th Cir. 1998), *citing United*

*States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993).

**(B) Whether Alexander had a Cognizable Privacy Interest in the**

**Property.**

The Supreme Court has held that a claimant alleging a Fourth Amendment

violation "must have a cognizable Fourth Amendment interest"—a concept known

as "Fourth Amendment standing." *Byrd v. United States*, 138 S. Ct. 1518, 1530, 200

L. Ed. 2d 805 (2018). In other words, "the application of the Fourth Amendment

depends on whether the person invoking its protection can claim a justifiable, a

reasonable, or a legitimate expectation of privacy that has been invaded by

government action." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L.

Ed. 2d 220 (1979) (internal quotation marks omitted).

The trial court erroneously avoided deciding this threshold question, stating it

"need not determine whether Albert had a sufficient privacy interest,"[41] because it

concluded the searches fell within an exception to the warrant requirement. The

_____

[41] ROA.7579.

19

court cannot logically conclude that the plain view exception applies without first establishing that Alexander had a Fourth Amendment interest in the property being searched and seized. This error alone warrants reversal.

The record establishes ample evidence of Alexander's privacy interest: (1) Alexander's historical connection to the property, which was his grandparents' home; (2) his payment of back taxes and utility bills for the property; (3) his personal belongings, including family mementos and renovation materials, stored throughout the residence; (4) his historical pattern of residing there; and (5) perhaps most tellingly, the officers' own belief and representations to the magistrate that the property was Alexander's residence.

Indeed, Strong obtained search warrants for the premises based explicitly on her representation that it was Alexander's residence. The government cannot reasonably claim a legitimate basis to search Alexander's "residence" in warrant applications, then deny his privacy interest in that same property to avoid Fourth Amendment scrutiny.

The Supreme Court has established that one need not be present at the time of a search, nor have exclusive possession of the premises, to maintain a reasonable

20

expectation of privacy.[42] Alexander's substantial connections to the property—maintaining it, renovating it, paying its taxes and utilities, and storing his belongings there—establish a privacy interest sufficient to trigger Fourth Amendment protections, regardless of who else may have occasionally resided there or whether he was present during the search.

The trial court used the following analysis to justify the seizure of property, which was admittedly not described in the initial warrant:

> The summary judgment record is not unambiguous as to whether Albert had "a justifiable, a reasonable, or a legitimate expectation of privacy" with respect to the 212 I-B Street property. For example, even if Albert renounced his inheritance rights in the property, police records show Albert's address as 212 I-B Street, 213 and Dashawna and Sharlette alleged that they had been living at 212 I-B Street with Albert or with his permission for several months. And overall, the actions of the defendant officers throughout the episode shows [sic.] that they believed Albert to have an interest in 212 I-B Street when they searched it […] However, because Fourth Amendment standing is not jurisdictional, the Court need not decide that issue before considering the merits of a claim of unreasonable search or seizure. Because the Court concludes that the searches and seizures at issue fall within an exception to the warrant requirement and therefore comply with the Fourth Amendment, it need not determine whether Albert had a sufficient privacy interest in the residence at 212 I-B Street to trigger the protections of the Fourth Amendment.[43]

---

[42] *See Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) (Overnight guests had an expectation of privacy.)

[43] ROA.7579, *see also at Alexander v. City Police of Lafayette*, Case No. 6:11-CV-01749, 2024 U.S. Dist. LEXIS. 229832; 2024 WL 5181962.

Thus, the trial court avoided a decision on Mr. Alexander's expectation of privacy. However, as the trial court and the plaintiff-appellant have pointed out, the record is replete with evidence suggesting Mr. Alexander did have an expectation of privacy at the address as he had resided there with family, stored his belongings there,[44] and the defendants themselves obtained a warrant to search that residence, to breach that privacy, to search for alleged firearms belonging to Mr. Alexander.[45]   There is at least enough of "a justifiable, a reasonable, or a legitimate expectation of privacy" demonstrated in the record to defeat summary judgment and require trial or a subsequent determination of this issue.   Even though there was no record ownership of 212 I-B Street, the court record demonstrates Alexander had a "cognizable interest"[46] in the property, because he paid bills for the property, allowed use of the property, and stored his belongings at the property. Should the Court find no expectation of privacy here, any home could justifiably be searched when its

---

[44] ROA.7186, and citation therein.

[45] ROA.5420-21 (Rec.Doc. 203-40); At trial Defendant Strong testified she obtained a warrant for the address because the utilities were registered in Mr. Alexander's name and posted permits were issued in his name. *See also* pgs. 5435-36 testimony of Defendant Parker, indicating that the police believed the home to be Mr. Alexander's based on objective evidence and proceeded accordingly. *See United States v. York*, 895 F.2d 1026, 1029 (5th Cir. 1990); "Indeed, the right to be free from unreasonable government intrusion into one's own home is a cornerstone of the liberties protected by the Fourth Amendment."  See Also

[46] *Terrence Byrd v. United States*, 584 U.S.395,410,138 S. Ct.1518,1530, 200 L. Ed. 2d 805 (2018).

occupants were temporarily away on vacation or staying with relatives. Thus, a "reasonable expectation of privacy" exists, because Alexander "exhibited an actual (subjective) expectation of privacy;" and, secondly, that expectation was "one that society is prepared to recognize as reasonable." *Katz*, 389 U.S. at 361 (Harlan, J., concurring) (internal citations omitted.)

**(C) Whether the Officers exceeded the warrant and were justified in relying on the plain view doctrine.**

*(i) Plain View*

Eschewing a determination of the privacy right, the trial court directly applied the "plain view" exception to the warrant requirement to determine whether seizure of a random assortment of household goods was justifiable under exigent circumstances.[47] However, the record shows, through uncontroverted testimony, that it was not immediately apparent that the balance of the items in the house were "evidence of a crime or contraband."[48]

Under the Fourth Amendment, "searches conducted outside the judicial process, without prior approval by judge or magistrate are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz*

---

[47] ROA.7577, *et seq.*
[48] *United States v. Turner*, 839 F.3d 429, 432-33 (5th Cir. 2016).

*v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967).

The "plain view" doctrine is one of the "specifically established and well-delineated

exceptions" that may justify a warrantless seizure. *Arizona v. Hicks*, 480 U.S. 321,

326, 107 S. Ct. 1149, 1153, 94 L. Ed. 2d 347 (1987). The doctrine permits an officer

to conduct a warrantless search if: (1) the officer is lawfully in a position to view the

area where the item is located; (2) the item is in plain view; (3) the incriminating

nature of the item is **immediately apparent**; and (4) the officer has a lawful right of

access to the item. *Horton v. California*, 496 U.S. 128, 136-37, 110 S. Ct. 2301,

2307, 110 L. Ed. 2d 112 (1990) (**Emphasis supplied**). The incriminating nature of

an item is immediately apparent if the officer has probable cause to associate the

item with criminal activity. *Payton v. New York*, 445 U.S. 573, 587, 100 S. Ct. 1371,

63 L. Ed. 2d 639 (1980).  "The extension of the original justification is legitimate

only where it is immediately apparent to the police that they have evidence before

them; the 'plain view' doctrine may not be used to extend a general exploratory

search from one object to another until something incriminating at last emerges."

*Horton*, 110 S.Ct. at 2307, *citing Coolidge v. New Hampshire*, 403 U.S. 443 (1971).

Regarding this *Horton* analysis, the trial court smooths over the conflicting

evidence in the record, which presents serious issues of fact sufficient to defeat

summary judgment. The trial court divined that Strong had probable cause to believe the items they seized were evidence of a crime or contraband because there was a "practical, nontechnical probability" that incriminating evidence was involved. However, in this instance, the testimony belies that, for most of the items seized, there was absolutely no distinction between these items and the everyday items that could be found in any home being renovated. Also, the trial court's analysis ignores that there is a temporal element to the *Horton* analysis: the indicia of criminality and probable cause must be immediately apparent, not the product of further exploration. The items described in each successive search warrant were narrow in Alexander's case. However, the record demonstrates the officers involved searched and seized a broad assortment of items.

Alexander notes, solely as proof of the breadth of the Fourth Amendment intrusion and injury, the LPD later auctioned many of the items that were seized, after the Lafayette Parish Council adopted an ordinance allowing the sale in May, 2016, including:[49] a crock pot, a "Presto" fryer, an electric scooter, a flat screen TV, four DVD players, a computer printer, an air compressor, a "work light," a rice cooker, a gaming chair, a "tower" heater, four DVDs, and other "misc. accessories."

---

[49] ROA.5580.

These items were not mentioned in any warrant or articulated to be part of any crime by any officer, yet were seized, held for five years, then sold to the highest bidder.

Consequently, the LPD violated Alexander's Fourth Amendment rights, which were clearly established at the time of the raids and his arrest. With the first search on January 4, 2011, Strong, Parker, and the other officers were limited to searching for guns. After they secured the pellet guns, they took advantage of being in the residence to search it and examine and document its contents, converting a lawful search for weapons into an illegal fishing expedition for items which they only had an inchoate belief were stolen—a belief founded upon the unsubstantiated claims of two disgruntled women who had an interest in Alexander's arrest. They confiscated household kitchen appliances, electronics, and toys that were not immediately incriminating and had no nexus to guns.

They returned to Alexander's home the next day with a warrant to seize the furniture and decorations after taking the information they unlawfully obtained for these objects and using it to find police records to "establish" they were stolen. In doing so, Strong and Parker ignored a report indicating other people may have been responsible for the theft. They also disregarded the fact that the furniture lacked serial numbers or other identifying features, Clayton Homes's invoices did not have

such identifiers, and the furniture was available for purchase elsewhere. Therefore, the officers lacked probable cause for the warrant to take these items. While all the furniture was being loaded into the horse trailer, Strong and Parker exceeded the warrant by performing a general search of the backyard and carport where they examined and documented the hot tub, yard equipment, tools and building materials.[50]

Although the warrant was based on information from an illegal search, it recited authority to seize the hot tub, a hot water heater and roofing shingles. However, Strong and Parker confiscated rebar, insulation, and fans (among other things) which were not contraband and had no nexus to the purpose of the third search warrant. The searches were efforts to satisfy Strong and Parker's unreasonable beliefs that Alexander was stealing goods and storing them at his home with no probable cause or particularized suspicion outside of the items described in the warrant.

Officer Strong's own testimony fatally undermines the plain view doctrine's application. When asked directly whether she had probable cause or merely reasonable suspicion when seizing Alexander's property, Strong admitted, "I don't remember, was there specific information that we had at the time whenever we went

---

[50] *See generally* ROA.4840-4926 (Strong deposition); ROA.6068-70, 6075-85 (Parker deposition); ROA.7413-26 (Cormier Deposition).

in for that first search warrant or if we did not [...] So it's difficult for me to answer that question because I really cannot recollect what my thoughts were twelve years ago."[51] Strong further admitted that no specific evidence regarding the seized items' stolen nature was documented in her report. This admission directly contradicts the "immediately apparent" requirement of the plain view doctrine, which demands officers have probable cause—not merely reasonable suspicion—at the moment of viewing the item, not after subsequent investigation.

(ii)     *The trial court's distinguishing of Creamer was erroneous.*

In *Creamer*[52] this Honorable Court affirmed the trial court's finding police officers' search of a business and apartment was unlawful and unreasonable, and denied officers' the defense of qualified immunity under similar facts. In its reasoning, the court said the fact that the plaintiff operated a used merchandise business where there was a possibility that some of the items might have been stolen, does not mean that every item in the business premises is automatically endowed with the kind of incriminatory character that opens an exception to the Fourth Amendment's warrant requirement. *Id*. Additionally, the fact that "none of the other items seized had any connection with the television sets that were listed in the

---

[51] ROA.4899.
[52] *Creamer v. Porter*, 754 F.2d 1311, 1318 (1985).

warrant" reinforced the illegality of their seizures under clearly delineated Fourth Amendment precepts. *Id.* Thus, the *Creamer* court found the officers' search beyond the items specified in the warrant was clearly unreasonable. As the Fifth Circuit stated, "No exception authorizes the continued search of the premises under these circumstances after the items listed in the warrant had been seized." *Id.*

Like the police in *Creamer,* the defendant officers here violated clearly established Fourth Amendment rights. In affirming that the second prong of qualified immunity was satisfied, the Fifth Circuit noted:

> All of the officers had several years of experience on the police force, ranging from six to sixteen years. All had attended classes where the law on search and seizure had been presented to them. The law regarding the permissible scope of a search where items in a warrant have been particularly described is hardly an uncertain and evolving area of law. *Creamer*, 754 F.2d at 1319.

Here, Strong, Parker, and Cormier testified to having many years of experience with the LPD: Strong has served with the LPD for 18 years as of 2022;[53] Parker had been with LPD for nearly three years as of 2010.[54] Testimony established all three were trained in crime investigative procedures, search and seizure law, and/or evidence handling.[55] Notably, although Strong testified she had participated in at least one

---

[53] ROA.4841 (p. 5, l. 17-24).
[54] Rec. Doc. 203-15, p. 11, ll .7-9.
[55] ROA.4936 (at p. 35, *et seq.*); ROA.4791.

search where a multitude of items were confiscated, she also testified that these seizures were drug-related, where indicia of crimes are often unmistakable.[56]

However, the officers' testimony reveals a startling lack of understanding of the established legal concepts governing permissible arrests, searches, and seizures.[57] For example, Parker could not describe the Fourth Amendment requirements or contents in any detail.[58] Moreover, each officer admitted to actions that exceeded the boundaries of clearly established constitutional law. Cormier, who was Strong's and Parker's supervisor, testified to his belief that they were acting within the scope of their search warrants. In his deposition Cormier stated that he would never verify that a seized item is listed on a warrant because he always took the word of a fellow officer.[59]

Parker testified to a startling lack of understanding of the basic tenets of the Fourth and Fourteenth Amendments and exceptions to the Fourth Amendment's warrant requirement.[60] Parker admitted they operated on a hunch with no articulable facts besides packaging.[61]

---

[56] ROA.4949-51.
[57] ROA.4846; ROA.4801-03, 4809-10.
[58] ROA.4845-46.
[59] ROA.7418 (Cormier deposition, pg. 24).
[60] ROA.4800 (pp. 52-3).
[61] ROA.4801.

Strong did not find it unreasonable to search Alexander's house for three hours looking for munitions, after they had already found and secured the BB and pellet guns.[62] Strong admitted to having agents from local retailers take property away from Alexander's residence.[63] Strong admitted that she had no prior experience with a warrant search and seizure of this size, "outside of a narcotics operation."[64]

More concerning is that these officers had access to these rules and chose not to consult them. Strong testified that the D.A. provided LPD officers with copies of search and seizure law and that she carried a copy with her in the field.[65] Rather than consult these guidelines when they had ample opportunity to do so, the defendant officers went with their "gut" by conducting exploratory searches, confiscating whatever items they subjectively believed were fruits of a crime, and then giving those items away to any party that offered "proof" of ownership. Plaintiff's expert, Andrew J. Scott, III, D.C.J. opined that Strong and Parker violated their own LPD Orders, as well as internationally recognized standards, in extending the search.[66]

These officers' testimony makes it clear that Alexander's property was seized

---

[62] ROA.4883-4884.
[63] ROA.4896 (pp.223- 224, ll. 6-9).
[64] ROA.4895 (p. 220, ll. 6-16).
[65] *See* Rec. Doc. 203-17, pp. 20-21.
[66] ROA.5812.

outside of the legal authority and plain language of the warrants, amounting to a fishing expedition to discover incriminating evidence—they took an inconsistent assortment of household items. All three searches were pretexts for unlawful exploratory searches to find evidence of crime with which to tie Alexander.

However, **most importantly** to this analysis, once officers determined in the first search that there were no firearms and ammunition in the residence, and once only a BB gun and pellet rifle had been secured, Strong and Parker admitted that they had no articulable facts to determine that any of the items were stolen, so Strong was forced to call the alleged victim Sharlette. As the evidence and the trial court's opinion both show, Strong attempted to use this call to elicit more information.[67]

Therefore, whatever particularized probable cause these officers had to differentiate these items from any standard household item was developed **after** a phone call was made, and further, more extensive searching, outside the scope of the warrant, was undertaken.  Furthermore, as Strong admitted during her deposition, she couldn't remember what was immediately identifiable as an indicium of criminal activity, e.g. rice cooker, and had to make the call to Sharlette to justify any further

---

[67] ROA.4885.

search.[68]

The *Creamer* court specifically held that "the fact that suspected stolen goods were found in a store selling used merchandise did not give police carte blanche to search and seize anything and everything in the store."[69] Similarly, finding items in original packaging in a home under renovation doesn't automatically make their "incriminating nature immediately apparent." The judge concluded this created a stronger basis for probable cause in Alexander's case, but this reasoning is flawed. In *Creamer*, officers had information about **specific** stolen television sets that were positively identified by the owner, Mr. Johnson, while in Alexander's case, officers had broader, ambiguous allegations from Sharlette and Dashawna about "numerous stolen items" in the home. Vague allegations about unspecified stolen items provide less specific probable cause than the identified television sets and the list Mr. Johnson made in *Creamer* because specificity is at the core of Fourth Amendment protections. When officers have details about particular items—like the television sets in *Creamer* with specific makes, models, or serial numbers—they possess concrete, articulable facts that create a nexus between those specific objects and

[68] ROA.4848 and ROA.4946 (Strong deposition, pp. 75-77). Strong's deposition appears in two parts in the record in "Vol-647640" at pp. 4840-4926 (25-30016.4840—25-30016.4926) and at pp. 4927-4952 (25-30016.4927—25-30016.4952).
[69] *Creamer*, 754 F.2d at 1319.

33

criminal activity.

In contrast, the instant general information about "furniture and other electronics," which lacks articulable descriptions or specific identifying characteristics, impermissibly broadens the scope for search and seizure. This lack of particularity fails to constrain officer discretion, undermines the warrant requirement's purpose of neutral pre-search judicial review, and contradicts the Fourth Amendment's foundational principle that searches must be particularly described and supported by probable cause for specific items. The instant general exploratory search is precisely the evil the Fourth Amendment was designed to prevent.

Therefore, trial court's misapplication of the plain view doctrine and erroneous distinguishing of *Creamer* fundamentally undermined its qualified immunity analysis, which requires examination of: (1) whether the official violated a statutory or constitutional right, and (2) whether that right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011).

Regarding the first prong, the officers obviously exceeded the scope of the warrant. They reached a point where their search for the items identified in the

34

warrant had concluded, and they continued their search based on information they elicited from a phone call. Therefore, admittedly, there was no "immediate" justification for **any** of the items.

Regarding the second prong, the trial court's error critically impacted the "clearly established" analysis because the Fifth Circuit had already established in Creamer that officers cannot conduct exploratory searches beyond the scope of their warrant, even when some items might be suspected stolen property. The Supreme Court further confirmed in *Arizona v. Hicks* that additional investigative steps to establish probable cause constitute a new search requiring separate justification.[70]

The officers' conduct violated well-delineated Fourth Amendment principles that any reasonable officer would understand: after finding only BB guns (not the firearms described in the warrant), continuing to search Alexander's residence became an impermissible general exploratory search. The law governing the permissible scope of a search when items in a warrant have been particularly described "is hardly an uncertain and evolving area of law." *Creamer*, 754 F.2d at 1319. Like those officers in *Creamer*, the officers here had several years of experience and training in search and seizure law. Yet their testimony reveals a

---

[70] 480 U.S. 321, 324-25 (1987) (moving stereo equipment to check serial numbers constituted a "search" separate from the initial entry).

startling lack of understanding of the Fourth Amendment's basic principles, with Parker unable to describe the Fourth Amendment requirements in any detail, and Cormier admitting he didn't verify seized items against the warrant's specifics.[71]

Perhaps most significantly, the trial court disregarded Alexander's expert testimony as "moot" after granting summary judgment, effectively preventing consideration of evidence that would have established the officers' violation of clearly established law. The expert opined that Strong and Parker violated LPD Orders and clearly established Fourth Amendment law when they extended the search to items not included in the warrant and not "obvious contraband or fruits of a crime on its face." We now turn to a more specific examination of the third and fourth elements from *Horton, supra*, as the officers' testimony demonstrates they did not "immediately" recognize the incriminating nature of the seized items.

**(D) Whether, to a reasonable officer, the incriminating nature of the specific items seized would have been immediately apparent under a totality of the circumstances.**

As this Court established in *Creamer*, "the fact that suspected stolen goods were found in a store selling used merchandise does not mean that every item in the

---

[71] ROA.4719-22.

business premises is automatically endowed with the kind of incriminatory character that opens an exception to the Fourth Amendment's warrant requirement." *Creamer*, 754 F.2d at 1319. Similarly, finding some packaged electronics in a home under renovation does not transform every household item into apparent contraband.

At minimum, the factual disputes regarding whether the incriminating nature of the seized items was "immediately apparent" created genuine issues of material fact that precluded summary judgment. The trial court improperly resolved these factual disputes in favor of the moving party, contrary to the standard requiring all facts and inferences to be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). These disputed facts— particularly the timing and necessity of additional investigation to establish probable cause—are material to both prongs of the qualified immunity analysis and require resolution by a factfinder.

Instead of acting on immediate knowledge, the officers conducted additional investigations, making phone calls to Sharlette, checking serial numbers, and searching databases, to establish probable cause.[72] Strong testified that after finding the pellet guns, officers decided: "we need to look into [the items in the house] a

---

[72] ROA.4861(Strong deposition at pp. 82-3.)

little bit more, figure out where it came from."[73] This additional investigative activity **after** satisfying the warrant's objective demonstrates that the incriminating nature of the items was not "immediately apparent" as required under clearly established law.

Strong testified, "I don't think it was my independent decision to seize the items. It would have been a collaborative effort on several other officers and supervisors." (ROA.4929 [Strong deposition, pg. 9, ll.20-23]). Yet when pressed further about who specifically authorized the seizures, she repeatedly stated "I don't remember" (ROA.4930 [Strong deposition, pg. 10, l.18; but see pp. 10-11, generally]). This uncertainty about who made critical decisions to seize Alexander's property highlights the unreasonable nature of the search and creates a genuine dispute of material fact that precludes summary judgment.

In both *Creamer* and *Hicks,*[74] the officers attempted to justify an exploratory search after the execution of a warrant for particular items.  In *Creamer* the Court noted that even though the police were searching a pawn shop, "this does not mean that every item is automatically endowed with 'incriminatory character.'" *Creamer*, 754 F.2d at 1319.  Further, the court notes none of the subsequently seized items had any connection to the items described in the warrant.  *Id.*

---

[73] ROA.4947 (*Id.* at p.78, ll.10-11). *See also,* ROA.4929-48.
[74] *Arizona v. Hicks*, 480 U.S. 321, 94 L. Ed. 2d 347, 107 S. Ct. 1149 (1987).

In *Arizona v. Hicks*, 480 U.S. 321, 94 L. Ed. 2d 347, 107 S. Ct. 1149 (1987), the court was faced with a case of officers legally executing a warrant and subsequently moving a stereo to record a serial number, which they later "ran" to see if the item was stolen.  *Id*. at 1152. The Court noted that any "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry." *Id.* at 1152.

Strong testified that the house appeared "under construction."[75] She testified the Swat team immediately found and identified the pellet guns,[76] but at that point, "we need to look into [the items in the house] a little bit more, figure out where it came from."[77]  Both Strong and Parker testified that, after they satisfied the warrant, they made calls and began to look for serial numbers and check property versus known registries.[78] As stated in the section above, this is precisely where the search pursuant to a warrant crossed the line into an exploratory and warrantless search of unspecified property, under *Hicks* and *Creamer*.

First, Judge Summerhays gave excessive weight to officers' testimony that the

---

[75] ROA.4858 (pg. 73 of Strong deposition, l. 9)
[76] ROA.7221 (*Id.* at pg. 76).
[77] ROA.6222 (*Id.* at 78).
[78] *Id.*

items "appeared to be stolen" based on packaging and condition, despite the fact that a house under renovation would logically contain new, packaged items. At the very least, considering the testimony and the expert opinion, issues of fact remain regarding whether these items bore indicia of criminal activity sufficient to establish a probable cause that the items were evidence of a crime, when the seized items were not particularly identified as stolen, and were items that could be found in any house, and would not seem out of place in a home renovation.  Thus, the presence of packaged items in a home with an obviously unfinished interior is not inherently suspicious. Plaintiff's expert opined that Strong and Parker violated their LPD Orders and clearly established Fourth Amendment Law when they extended the search of Alexander's premises to items not included in the warrant and were not "obvious contraband or fruits of a crime on its face."[79]   The plaintiff's expert testimony raises an issue of fact that was ignored by the trial court.

Secondly, Strong admitted to seizing items as mundane as a rice cooker and scooter.  Only the officers' testimony exists to establish what evidence was seized. Officers took no photographs of allegedly packaged items, nor were pictures of packaged items logged into evidence during the initial search.   In fact, Strong

---

[79] ROA.5812.  A Daubert motion was filed to strike this report, but the trial court pretermitted the motion as moot, considering the granting of summary judgment.

confirmed in deposition that many household items were not in packaging and were not inherently suspicious. Thus, neither the warrant, the very general description given by Sharlette Deshawna, nor the appearance of the packaging could implicate an extensive list of the items seized. For these unpacked everyday household items, the trial court ignores the fact that there is no justification for search and seizure.

Considering Sharlette had admitted to living in the house, these items would have no indicia of criminality and could not establish any probable cause. To any reasonable officer, there would be no "incriminating nature of the item […] immediately apparent," yet the trial court blanketly extended the plain view exception to these items. *Horton, supra.*

It is at least an issue of fact whether there was any justifiable reason to effect a search and seizure of these items, if not an admission that there was not a justifiable reason to seize them under the plain view doctrine. And even if it is arguable that some probable cause was developed for specific items, after defendants undertook three hours of more searching, waiting, and corroborating, this could still not extend to all the items seized from the house, like the scooter or the rice cooker, because not all of the items were immediately identified as evidence or corroborated to the very general description given by Sharlette and Dashawna in their subsequent

41

reporting of "furniture, electronics and even a hot tub," if it was even reasonable to rely on their statements, after they had failed to any mention of such merchandise in their initial reports.[80]

Such rationales provide slippery slopes of justification to search any items commonly found in a residence, given plain view, and dramatically expand legal search parameters, to the point where it renders the Fourth Amendment's requirement that a warrant must contain a particular description of a thing to be seized superfluous.

Officer Strong's testimony confirms what the objective evidence shows: the officers had no specific information connecting any particular seized items to any reported theft. When asked if she could tell why officers seized items that weren't on any police reports, Strong responded, "I really don't, I really don't know. I really don't remember what information or who made the decision to take specifically these items."[81] This admission fundamentally undermines the application of the plain view doctrine, which requires immediate recognition of an item's incriminating nature, not a hunch based on general suspicion.

---

[80] ROA.5962.
[81] ROA.4931 [Strong deposition, p. 15, ll. 4-7]).

## (j) CONCLUSION

For the foregoing reasons, the district court erred in granting summary judgment on the basis of qualified immunity. The undisputed facts establish that officers violated Alexander's clearly established Fourth Amendment rights in three distinct ways:

First, LPD officers exceeded the scope of a valid warrant that authorized only a search for firearms and ammunition. After finding only BB guns and pellet rifles, which satisfied the warrant, the officers remained on the premises and conducted a general exploratory search without legal justification.

Secondly, improperly invoking the plain view doctrine to seize everyday household items when their allegedly incriminating nature was not "immediately apparent." The officers' own testimony reveals they needed to conduct further investigation—making phone calls, checking serial numbers, and consulting databases—to establish probable cause, thereby failing the "immediately apparent" requirement of *Horton, supra*.

Thirdly, disregarding the clearly established Fifth Circuit precedent in *Creamer, supra,* which specifically prohibits the very type of warrant-exceeding exploratory searches conducted here. When officers have a warrant for specific items

43

and those items are found or determined not to be present, any continued search beyond those parameters violates clearly established Fourth Amendment jurisprudence.

The trial court compounded these errors by pretermitting consideration of Alexander's expert's testimony, which would have established violations of both department policy and constitutional law, and by improperly resolving disputed material facts regarding the nature of the seized items in favor of the moving party. No reasonable officer could have believed the conduct at issue was lawful under the circumstances, given the clearly delineated limits of the plain view doctrine established in Supreme Court and Fifth Circuit precedent. The Fourth Amendment's protection of the home cannot be undermined by allowing such expansions of the plain view doctrine. The Fourth Amendment does not discourage officers in the field from making inferences drawn from evidence. Its protections simply mandate that those inferences be drawn by a neutral and detached magistrate instead of an officer in the midst of making an arrest, or in this case a seizure of property. The search at issue improperly expanded the scope through a phone call and moving items in the home, prior to seeking the second warrant. Therefore, defendants are not entitled to

qualified immunity. This Court should reverse the district court's ruling and remand

for further proceedings consistent with this analysis.

## (k) SIGNATURE OF COUNSEL

Respectfully Submitted,

  /s/ Bruce C. Betzer
Bruce C. Betzer, Bar No: 26800
**The Law Office of Bruce C. Betzer**
3129 Bore Street
Metairie, Louisiana 70001
Telephone: (504) 832-9942
Facsimile:   (504) 304-9964
*Attorney for Plaintiff*

45

## (l) **CERTIFICATE OF SERVICE**

I hereby certify that, on this 16th day of April, 2025, I have filed the foregoing brief with the Clerk of the Court using the CM/ECF system, which will electronically notify this filing to the following counsel of record in this case:

　　　　　　　　　*/s/ Bruce C. Betzer*
Bruce C. Betzer, Bar No: 26800
***The Law Office of Bruce C. Betzer***
3129 Bore Street
Metairie, Louisiana 70001
Telephone: (504) 832-9942
Facsimile:   (504) 304-99

46

## <u>(m) CERTIFICATE OF COMPLIANCE</u><br><u>WITH RULE 32(g)(1)</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,303 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes produced by Microsoft Word 2010 software.

_/s/ Bruce C. Betzer_
Bruce C. Betzer, Bar No: 26800
***The Law Office of Bruce C. Betzer***
3129 Bore Street
Metairie, Louisiana 70001
Telephone: (504) 832-9942
Facsimile:   (504) 304-9964
*Attorney for Plaintiff*
